IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CALIXTO COLÓN-RIVERA, et al.,

       Plaintiffs

       v.

ASOCIACIÓN DE SUSCRIPCIÓN
CONJUNTA DEL SEGURO DE
RESPONSABILIDAD OBLIGATORIO,

       Defendant

CIVIL NO. 07-1875 (JP)

## OPINION AND ORDER

Before the Court are Defendant Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio's ("Association" or "JUA") motions for summary judgment (**Nos. 164 and 167**), Plaintiffs' opposition thereto (No. 188) and Defendant's reply (No. 199). Also before the Court are Plaintiffs' motion for partial summary judgment (**No. 160**), Defendant's opposition thereto (No. 190), and Plaintiffs' reply (No. 194). Plaintiffs brought the instant action pursuant to 42 U.S.C. § 1983 ("Section 1983") alleging violations of Due Process and Equal Protection under the Fourteenth Amendment and the Takings Clause under the Fifth Amendment.[1] Plaintiffs also bring claims under Puerto Rico law. Plaintiffs claim said violations occurred when the Association transferred funds,

---

1.    The Court notes that it dismissed the Equal Protection claims in an Opinion and Order and Partial Judgment entered on October 26, 2009 (Nos. 62 and 63).

CIVIL NO. 07-1875 (JP)            -2-

allegedly belonging to Plaintiffs, to the Department of the Treasury pursuant to Act 230.  For the reasons stated herein, Defendant's motions for summary judgment are hereby **GRANTED IN PART AND DENIED IN PART** and Plaintiffs' motion for summary judgment is hereby **DENIED**.

I.   <u>**MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE**</u>

The following material facts were deemed uncontested ("ISC UMF") by all parties hereto at the January 27, 2010, Initial Scheduling Conference (No. 107).

1.   On December 27, 1995, the Commonwealth of Puerto Rico enacted the Compulsory Motor Vehicle Liability Insurance Act, Act No. 253, codified as P.R. Laws Ann. tit. 26, § 8051-61 ("Act 253"), which required compulsory liability coverage of all motor vehicles that travel through Puerto Rico thoroughfares and provided the insured vehicle owner with $3,000.00 of coverage for damages caused to third parties per accident through fault or negligence in exchange for an uniform premium initially set at $99.00 per private vehicle and $148.00 for each commercial vehicle.  The liability insurance policy premium would be payable at the time of the issuance or renewal of the license and as part of the fees payable for the issuance of the license.

2.   No vehicle could travel through the Puerto Rican roads without complying with the coverage requirements of the

CIVIL NO. 07-1875 (JP)             -3-

Compulsory Motor Vehicle Liability Insurance Act and to do so would lead to a penal offense punishable with a $500.00 fine.

3. The compulsory liability insurance is to be subscribed by all insurance companies—the JUA and the traditional insurance companies. What Article 5 of Act 253 requires is for traditional insurance companies to subscribe compulsory liability to any motor vehicle owner who requests it, limiting the circumstances under which coverage can be refused.  The Insurance Commissioner, by regulation, has established the criteria under which the traditional insurance companies may reject an applicant for compulsory liability insurance.  The JUA provides compulsory liability insurance for all motor vehicles whose owners do not actively opt out of the compulsory liability insurance provided by said entity by purchasing traditional liability insurance with comparable or better coverage or who are rejected by a traditional insurance company.

4. JUA had additional functions: (a) to receive from the Secretary all premiums collected by the Secretary from the vehicle owners by reason of the mandatory insurance; and (b) to distribute among the participating insurance

CIVIL NO. 07-1875 (JP)               -4-

companies the premiums received from the Secretary as mandatory insurance premiums.

5.     The JUA is composed of all traditional insurers whose volume of premiums underwritten for motor vehicle liability insurance is greater than one percent (1%) of the total volume of motor vehicle liability insurance premiums underwritten in Puerto Rico.  JUA was given tax exempt status until 2002.  JUA's gains and losses would be shared by the participating vehicle insurance companies.

6.     The compulsory liability system would be effective starting January 1, 1998.  The vehicle owners who would seek issuance of a license during 1997 or would renew it during said year had the obligation to pay a proportionate share of the mandatory premium for the period which would cover the portion of 1998.

7.     Article 12 of Act 253 of December 27, 1995 provided as follows:

> Relationship between traditional liability insurance and compulsory liability insurance.—
>
> (a)  Those motor vehicle owners who have a traditional liability insurance in effect at the time of [the issuance] or renewal of the motor vehicle license, with a coverage similar to or greater than that of the compulsory liability insurance, may continue to use said traditional insurance to comply with the insurance requirements established in Article 4(a) of this Act.

CIVIL NO. 07-1875 (JP)                -5-

> (b)   The Commissioner is hereby empowered to establish, through regulations, those measures that may be necessary to provide for a fair and efficient interaction between the compulsory liability insurance and traditional liability insurance so as to guarantee that, at all times, the compulsory liability coverage required by this Act is in place.  Specifically, the Commissioner shall ensure that the private insurer who underwrites the traditional liability insurance acknowledges in the premiums charged for said insurance the amount of the payment received in compliance of the requirements stipulated in Article 4(a) of this Act.

8.   Article 7 of Act 94 of August 20, 1997 amended Article 12 of Act 253 to provide as follows:

> Relationship between the Traditional Liability Insurance and the Compulsory Liability Insurance.—

> (a)   Those motor vehicle owners who have a traditional liability insurance in effect at the time of issue or renewal of the motor vehicle license, with a coverage similar to or greater than that of the compulsory liability insurance, may continue to use said traditional insurance to comply with the insurance requirements established in this Act.

> (b)   The Commissioner is hereby empowered to establish through regulations, those measures that may be necessary so that motor vehicle owners who comply with the insurance requirements of this Act, may present attesting proof of the said compliance, so that a fair and efficient coordination between the compulsory liability insurance and traditional liability insurance can be attained.  The Commissioner shall also ensure that the private insurer who underwrites the

CIVIL NO. 07-1875 (JP)          -6-

> traditional liability insurance acknowledges in the premiums charged for said insurance, the amount of the payment received in compliance of the requirements stipulated in Article 4(a) of this Act.

9. Article 9 of Act 201 of December 29, 2009 further amended Article 12 of Act 253 to provide as follows:

> Relationship between the Traditional Liability Insurance and the Compulsory Liability Insurance.—
>
> (a) Those motor vehicle owners who have a traditional liability insurance in effect at the time of issue or renewal of the motor vehicle license, with a coverage similar to or greater than that of the compulsory liability insurance, may continue to use said traditional insurance to comply with the insurance requirements established in this Act.
>
> The private insurers, agents, or brokers shall issue their insureds or clients a certificate authorized by the Joint Underwriting Association as evidence of compliance with the compulsory liability insurance in those cases where the motor vehicle owner has a traditional liability insurance in place with a coverage similar to or greater than that of the compulsory liability insurance. This certificate of compliance will have the effect of exempting said motor vehicle from the payment of the portion of the motor vehicle's license fees corresponding to the compulsory liability insurance.
>
> (b) The Commissioner is hereby empowered to establish through regulations, those measures that may be necessary so that motor vehicle owners who comply with the insurance requirements of this Act, may present attesting proof of the said compliance, so that a fair and efficient

CIVIL NO. 07-1875 (JP)            -7-

> coordination between the compulsory liability insurance and traditional liability insurance can be attained. The Commissioner shall also ensure that the private insurer who underwrites the traditional liability insurance acknowledges in the premiums charged for said insurance, the amount of the payment received in compliance of the requirements stipulated in Article 4(a) of this Act.

10.  Nevertheless, during 1997 payment of the double premium was inevitable.  To cover that situation the regulations provided that the vehicle owner would be reimbursed by his insurance company the corresponding portion of the mandatory premium paid in 1997 when he or she would renew his traditional insurance policy in 1998.

> Rule LXX, Article 12(d), provided as follows:
>
> When invoicing the traditional liability insurance premium corresponding to the 1998 renewal, every private insurer shall inform its insured that they shall deduct from the payment of the premium to remit, the amount they paid for the obligatory liability insurance in 1997, when renewing their motor vehicle licenses, as long as it has not entered into effect in 1998, because a traditional liability insurance coverage similar or greater than that of the obligatory liability insurance exists. The insured shall submit copy of the license of each motor vehicle in question, evidencing renewal thereof and the payment made for obligatory liability insurance.
>
> When traditional liability insurance policy is not renewed in 1998, the private insurer shall claim from the Joint Underwriting Association the amount paid for obligatory liability insurance in 1997, for the motor vehicles insured pursuant to said policy and shall remit

CIVIL NO. 07-1875 (JP)            -8-

> this amount to the owner of the vehicles as long as it does not enter into effect in 1998, because a traditional liability insurance coverage similar greater than that of the obligatory liability insurance exists. The owner of the vehicles shall submit copy of the license of each motor vehicle in question evidencing the renewal thereof and the payment made for the obligatory liability insurance.
>
> When invoicing the traditional liability insurance premium corresponding to the issue of new policies in 1998, every private insurer shall deduct from the payment of the premium to be collected, the amount paid by its insured, for the obligatory liability insurance in 1997 that is not returned in 1998 because traditional liability insurance coverage similar or greater than that of the obligatory liability insurance exists. The owner of the vehicles shall submit copy of the license of each motor vehicle in question, evidencing renewal thereof and the payment made for obligatory liability insurance.

11.   One of the insurance companies, the Puerto Rican and American Insurance Company, published a brochure for the benefit of its insured individuals which stated:

> 21.   If I already have Traditional Liability Insurance, must I avail myself of the Compulsory Liability Insurance?
>
> Vehicle owners who have Traditional Liability Insurance whose coverage is similar or broader than the one by the Compulsory Liability Insurance may use said Traditional Liability Insurance to comply with the insurance requirement established by law.
>
> However, during 1997, you may not use your Traditional Liability Insurance to comply with the requirements of payment of a premium that the law establishes for the Compulsory Liability Insurance. During

CIVIL NO. 07-1875 (JP)          -9-

> 1997, every vehicle owner, upon renewal of
> his or her yearly state issued license
> plate sticker must pay the pertinent
> Compulsory Liability Insurance premium.
> This form of payment will only occur in
> 1997.  Beginning 1998, you will only pay
> the pertinent Traditional Liability
> Insurance premium to your insurer and you
> will not have to pay the Compulsory
> Liability Insurance in the collection
> center.
>
> 22.  If I already have Traditional Liability
> Insurance, what happens with the Compulsory
> Liability premium that I paid in the
> Collection Center in 1997?
>
> If in 1998 you have Traditional Liability
> Insurance, your insurer will credit the
> premium you already paid in 1997 for the
> Compulsory Liability Insurance upon renewal
> of your Traditional Liability Insurance in
> 1998.

12.  The Statement of Motives of Act 94 of August 20, 1997

states:

> Act No. 253 of December 27, 1995, known as the
> "Compulsory Motor Vehicle Liability Insurance
> Act," places Puerto Rico on an equal footing
> with other jurisdictions of the United States,
> in which a property damage liability insurance
> is required so that motor vehicles may travel on
> public highways.  This legislation resulted from
> the acknowledgment that Puerto Rico needed to
> establish a compulsory liability insurance
> system to protect motor vehicle owners in the
> event they are involved in a traffic accident
> causing damages to a third party.
>
> Act No. 253 entrusted the Insurance Commissioner
> with the administration and implementation of
> the provisions of the referred law, as well as
> seeing to its compliance.  Among these duties
> are the establishing of an information and
> orientation program geared to the consumers of

CIVIL NO. 07-1875 (JP)          -10-

insurance, establishing regulations to
coordinate the interaction between Traditional
Liability Insurance and the Compulsory Liability
Insurance, and the establishment of criteria to
be used by insurers authorized to underwrite
vehicle insurance so that they may be able to
reject proposed insurance candidates. He/she
shall also adopt the necessary regulations to
establish the structure and operation of the
Joint Underwriting Association, which is the
insurance entity created primarily to offer
Compulsory Liability Insurance to those who
cannot obtain it from other insurers. On the
other hand, he/she shall also have the duty of
presenting before the Legislature the proposal
for the Initial Liability Determination System
so that the procedure for claim adjustment and
resolution may be carried out promptly and
expeditiously.

After one year of intense analysis and work by
the Insurance Commissioner in order to comply
with the duties entrusted, we have concluded
that there are areas within the Compulsory
Liability Insurance Act that deserve
modification in order to expedite the execution
of its provisions. One of the most important
areas that this bill intends to modify is that
of the compulsory liability insurance payment.
The Insurance Commissioner shall have the power
to establish through regulations alternate
payment methods, in addition to the mechanism
established through the Secretary of the
Treasury for the payment of the compulsory
liability insurance, so that the owner of the
motor vehicle who wishes to acquire the
compulsory liability insurance may enjoy
additional options and easier methods for such
acquisition.

Likewise, this legislation shall empower the
Insurance Commissioner to establish through
regulations, a procedure that will allow motor
vehicle owners who meet the insurance coverage
required by law through a traditional liability
insurance in effect, to present attesting proof
of such compliance, without having to pay the

CIVIL NO. 07-1875 (JP)          -11-

compulsory liability insurance along with the
payment for the issuing or renewal of motor
vehicle licenses.   Thus, motor vehicle owners
shall not have to unnecessarily disburse any sum
of money whatsoever on account of compulsory
liability insurance at the time of the issuing
or renewal of their motor vehicle licenses,
while they hold and can prove they have the
traditional liability insurance.

The measure under consideration grants immunity
to the Board of Directors of the Joint
Underwriting Association as a body, to the
directors both in their institutional as well as
their personal capacity, and to their officials,
provided that in the discharge of their duties
they do not violate the fiduciary duty which
binds them before the Joint Underwriting
Association.    Likewise, this legislation
establishes penalties for the Board of
Directors, or those directors who, in their
institutional or personal capacity, damage or
impair the interests of the Joint Underwriting
Association or of any of its insurer members, or
use their positions as directors to benefit or
obtain undue advantage in behalf of the insurers
they represent or of third parties.

This legislation shall also empower the
Insurance Commissioner to grant the Joint
Underwriting Association a two million
(2,000,000) dollars loan, of which one million
(1,000,000) dollars is to be used to meet the
minimum surplus required for the Joint
Underwriting Association, and the remaining
million (1,000,000) dollars shall be used to
cover initial operating expenses of the Joint
Underwriting Association.   The granting of this
loan shall be governed by corresponding
provisions contained in the Insurance Code of
Puerto Rico.

13.   Under this delegation, the Insurance Commissioner issued

Rule LXX for the Instrumentation of the Compulsory Motor

Vehicle Liability Insurance to ensure, among other things,

CIVIL NO. 07-1875 (JP)          -12-

that the owners of motor vehicles who purchased
traditional liability insurance would either not have to
pay the corresponding premium when they acquired or
renewed their vehicle license or be able to obtain a
refund of the amounts paid from his insurance company.
Thus, to avoid the payment of the compulsory insurance
premium by holders of traditional insurance, Rule LXX
provided for the JUA to issue a check payable to the
Secretary of the Treasury to be used by holders of
traditional liability insurance to pay for the compulsory
liability insurance premiums at the moment of renewing
their licenses.  Regulation No. 5737 of December 29, 1997
at 7, Article 10(a) provided:

> So that the [JUA] can provide to the insured the
> previously mentioned check on time, every
> private insurer must notify the [JUA] of the
> existence of every compulsory liability
> insurance or traditional liability insurance
> [policy] that will be used to comply with the
> compulsory liability insurance required by Law
> at least forty-five (45) days prior to the date
> of renewal of the motor vehicle license . . .
>
> If the check could not be issued timely . . .
> because the period between date of the renewal
> of the traditional liability insurance is less
> [than 45 days], the [private] insurer shall
> notify the motor vehicle of the need for him to
> pay to the Secretary of the Treasury the premium
> for the compulsory liability insurance prior to
> the payment of the traditional liability
> insurance. In this way, the motor vehicle owner
> may deduct the amounts paid to the Secretary of
> the Treasury the premium to be paid for the

CIVIL NO. 07-1875 (JP)          -13-

> traditional liability insurance and avoid the paying double for an insurance to comply with the compulsory liability insurance.

14. On July 22, 1998, Article 10(a) of Rule LXX was amended to clarify further the procedure for reimbursement when a holder of traditional liability insurance paid for the compulsory liability insurance when renewing his vehicle's license.  Thus, it was further provided that:

> In the same manner, When it is not possible to comply with the requirements of notice to the [JUA] within the period established herein due to the insured's failure to provide to insurer with the information required in *Request Information Form* sent to him, the traditional liability insurer shall notify the motor vehicle owner of the need for him to pay the Secretary of the Treasury for the compulsory liability insurance.  The insurer will refund to the insured the amount paid as soon as he receives the information required in the *Request for Information Form* and evidence that the payment [of the compulsory liability insurance] was made.  If the insurer does not receive the information required in the *Request for Information Form*, he shall deduct the amount paid [for the compulsory liability insurance] from the next renewal of the traditional liability insurance so long as the insured provides evidence that the payment was made.  If the traditional liability insurance is cancelled or not renewed, the insurer shall reimburse the amount paid together with any unearned premiums.
>
> On the other hand, if a traditional liability insurer does not comply with the notice requirement to the [JUA] within the established period despite the insurer having provided the information required in the *Request for Information Form*, the traditional liability insurer shall notify the motor vehicle owner of the need for him to pay to the Secretary of the

CIVIL NO. 07-1875 (JP)              -14-

> Treasury the premium for the compulsory
> liability insurance. The insurer shall
> reimburse to the insured the amount paid [for
> compulsory liability insurance] as soon as it
> receives evidence that such payment was made.

15. On September 15, 2000, the Rule LXX was further amended to

provide for an alternate mechanism to the issuance of a

check to the traditional liability policy holder to avoid

paying the compulsory liability insurance when renewing

his vehicle's license:

> So long as allowed by the Secretary of the
> Treasury, at the time of acquiring or renewing
> the motor vehicle license . . . of any [private]
> vehicle . . ., if such vehicle is covered by a
> traditional liability insurance policy with an
> equal or better coverage than that provided by
> the compulsory liability insurance or by a
> compulsory liability insurance issued by a
> private insurer, instead of the check mentioned
> in section (a) of Article 10 of this Regulation,
> a certification issued by the [JUA] or by the
> insurer to the effect that the vehicle is
> covered by a traditional liability insurance-
> policy with an equal or better coverage than
> that provided by the compulsory liability
> insurance or by a compulsory liability may be
> used as satisfactory evidence of compliance with
> the insurance required by Law.

16. The purpose of the amendment was to simplify the process

that the insurance companies followed "to provide their

insureds with evidence of compliance with the requirement

of the insurance necessary for the renewal of the vehicle

license." It also eliminated a significant number of

checks issued by the Association that never reached their

CIVIL NO. 07-1875 (JP)          -15-

destination "and activates the reimbursement of premiums that the insurers must perform, when their insureds, for any reason do not have them for the renewal of their vehicle licenses."  A Normative Letter was issued by the Insurance Commissioner explaining said amendment in detail.

17. Attachment A provided the Procedure for the Issuance of the Certification of Compliance.

18. If the motor vehicle did not present a certificate of compliance proving that he carries a traditional liability insurance, he had to pay the compulsory liability premium on the date of the issuance or renewal of the vehicle license and then must seek reimbursement from his insurer. "All pertinent regulations require any motor vehicle owner who, having a traditional liability insurance policy in place,  pays for the compulsory liability insurance, to seek reimbursement from his insurance company, *not from JUA*."  The insurer would then seek reimbursement from JUA of the amount reimbursed to the vehicle owner.

19. Rule LXX, Article 19 provided that JUA "would take all necessary actions so that once the authorized insurers would claim the premiums paid by their insureds to the Secretary of the Treasury by reason of the mandatory

CIVIL NO. 07-1875 (JP)              -16-

insurance, the latter [JUA] may forward promptly that correspond to them.

20.  Notwithstanding these regulations, by December 31, 1999 the total sum of $84,832,700.00 had been accumulated in JUA as unreimbursed double premiums not transferred to the different insurance companies for reimbursement.  On March 10, 2000 Ernst & Young LLP made its Report of Independent Auditors stating that there were accumulated an amount withheld or Retained for Account of Others the sums of $35,904,100 for the year 1998 and $48,928,600 for the year 1999 in JUA.  The reason for this retention was:

> Amount Withheld or Retained for Accounts of Others:
>
> As described in Note 1, premiums are collected by Hacienda at the time that the annual vehicle registration is issued or renewed.  Such amounts are remitted to the Association approximately on a semi-monthly basis.  If the vehicle owner is insured with a traditional insurer and pays the corresponding to compulsory liability insurance, the vehicle owner claims a credit for the amount paid to Hacienda from the premiums to be paid to the traditional insurer.  The traditional insurer will then request reimbursement from the Association.  At December 31, 1999 and 1998, the Association estimated that $48,928,600 and $35,904,100, respectively will be reimbursed to private insurers which liability has been recorded as "Amounts withheld or retained for account of others" in the accompanying Statutory-Basis Statement of Assets, Liabilities and Surplus.

CIVIL NO. 07-1875 (JP)              -17-

21.  Since early 2000 the Secretary of the Treasury started to
     withhold from JUA delivery of all the mandatory premiums
     that the Secretary collected from the vehicle owners for
     the compulsory insurance.  The reason for the withholding
     was to alleviate the Commonwealth's cash-flow problems.

22.  In 2001 a group of vehicle owners filed a class action in
     the  local  courts  claiming  reimbursement  from  the
     participating insurance companies and JUA.

23.  On August 3, 2001, Mr. Adrián Ortiz  then the President of
     JUA  wrote  to  Diana  Ojeda,  Esq.,  Assistant  Insurance
     Commissioner, that:

         . . . shortly we shall be implementing a new
         procedure that will allow the elimination of the
         need of an insured under a liability insurance
         policy to have to apply for the reimbursement of
         the  compulsory  insurance  premium.   Same  is
         possible, because recently the Department of the
         Treasury has begun to transmit to the Asociación
         de  Suscripción  Conjunta  de  Responsabilidad
         Obligatorio   (herein   "the   Association")
         information about the vehicles for which the
         licenses are renewed.

         Under  the  new  procedure,  at  the  moment  of
         issuing or renewing the traditional insurance
         policy,  the  insurer  will  deduct  the  amount
         equivalent to the compulsory insurance premium
         of the vehicles included in said policy and will
         request the Association to reimburse the applied
         discount.  On the other hand, the insured shall
         pay the premium for compulsory insurance at the
         time he renews the license to the vehicle which
         is sent to the Association by the Department of
         the Treasury.

CIVIL NO. 07-1875 (JP)          -18-

> With this mechanism, which utilization by the
> insurers shall be on a voluntary basis, it is
> also eliminated the need to use Certifications
> of Compliance with the compulsory insurance
> policy that are issued at the present.

24. In early 2002, a legislative measure was presented as Bill 2114 in the House of Representatives of the Commonwealth of Puerto Rico. It sought to have the double premiums accumulated in JUA as the item "Amount Withheld or Retained for Account of Others" be transferred to the Secretary of the Treasury.

25. On February 12, 2002, Juan Flores-Galarza then Secretary of the Treasury wrote to Hon. Francisco Zayas-Seijo, President of the Comisión de Hacienda of the House of Representatives in reference to Bill P. de la C. 2114 that the Bill contemplated to transfer to the Secretary of the Treasury the funds retained by JUA for account of others. He stated that JUA used part of the amounts collected as mandatory premiums to create a reserve that would cover the claims of the vehicle owners who had a traditional insurance policies. He stated further that the reserve accumulated exceeded the claims of the motor vehicle owners with a right to receive the reimbursement. He stated that excess in the reserve would be transferred to the General Fund but not the amount that should be available to be returned to the motor vehicle owners. He

CIVIL NO. 07-1875 (JP)              -19-

stated further that through efforts of the Administration the process of sending the reimbursement to the motor vehicle owners had been made more agile and that during the last months JUA had reimbursed $11 million. He also stated that during the years 1998, 1999 and 2000 the item had reflected amounts of $35,904,104; $48,928,630 and $72,371,902 and almost $92,000,000 in 2001. He added that this continued increase showed JUA's lack of interest in reimbursing the monies to the motor vehicle owners to whom it corresponded. He further stated that the Department would diligently process all applications for reimbursement promptly. He added further that of the $83.7 million only $20 million were to be available to be returned to the motor vehicle owners. He further stated that the balance was an excess reserve that did not belong to the motor vehicle owners and that JUA had administrative failures in its performance in identifying adequately a great amount of vehicle owners entitled to reimbursement.

26. On May 30, 2002, JUA filed a petition for Mandamus against the Secretary in the Puerto Rico Superior Court requesting an order that the Secretary transfer to JUA the withheld compulsory liability insurance premiums. By

CIVIL NO. 07-1875 (JP)           -20-

September 2002, the Secretary had withheld approximately
$173 million in premiums from JUA.

27.  On September 30, 2002 the Bill was approved and became
Act 230.  The Statement of Motives expressed in part:

> Third, during the existence of the Association,
> certain funds have been accumulated that do not
> belong to it.  This results from the fact that
> a great number of consumers who, although they
> have traditional liability insurance, pay the
> corresponding premium to the Compulsory Motor
> Vehicle Liability Insurance when they obtain the
> motor vehicle license for the first time or when
> they renew it, but they do not request the
> Association to reimburse the money as is their
> right.  During the years that the Association
> has been functioning, it has shown an inability
> to identify the owners of the accumulated funds.
>
> As established by the Puerto Rico Insurance
> Code, funds owed by an insurer under any
> insurance policy which have not been claimed by
> people with a right to them for a certain number
> of years become the property of the Commonwealth
> of Puerto Rico.  This Legislature understands
> that funds from premiums received by the
> Association from the Department of Treasury that
> do not belong to the Association, are of a
> different nature from the "unclaimed funds"
> referred to by the Puerto Rico Insurance Code.
> For such reason, it is of greater benefit to the
> public interest in general to immediately
> transfer those funds to the State Treasury,
> under the custody of the Department of the
> Treasury, regardless from the number of years
> that have elapsed since these funds were
> received by the Association without being
> claimed.  Of course, the former does not prevent
> any person who claims a right to the retained
> funds from filing a claim with the Secretary of
> the Treasury before the time established for the
> funds to become property of the state lapses.
> Accordingly, the Association must transfer the
> funds in the account known as "Funds Retained by

CIVIL NO. 07-1875 (JP)          -21-

> the Insurer Belonging to Others" in its balance
> sheet to the Secretary of the Treasury of the
> Commonwealth of Puerto Rico.

28.  In   November   2002   JUA   and   the   Secretary   reached   a
settlement   stipulation   in   the   Mandamus   action   in   the
Puerto   Rico   Superior   Court   whereby    the   Secretary
transferred   to   JUA   a   significant   portion   of   the
$173 million in insurance premiums that had been withheld.
Rather   than   transferring   the   full   amount   of   funds
withheld,   however,   the   Secretary   retained   approximately
$73 million - an amount corresponding to the amounts of
funds in the Reserve as of December 2001, which the JUA
was   required   to   turn   over   to   the   Secretary   pursuant   to
Act 230.

29.  In   February   2003,   the   JUA   filed   a   complaint   under
42   U.S.C.   §   1983   against   Juan   Flores-Galarza   in   his
personal   capacity   and   in   his   official   capacity   as
Secretary   of   the   Treasury.    In   the   complaint,   the   JUA
alleged   that   Flores-Galarza   took   the   JUA's   property
without   just   compensation   and   deprived   the   JUA   of   its
property without due process in violation of the Fifth and
Fourteenth   Amendments   and   §   1983.    Specifically,   JUA
contended   that   'in   order   to   alleviate   the   Commonwealth's
cash-flow   problems,'   Flores-Galarza   temporarily   withheld
'for   [an]   unreasonable   period   [ ]   of   time'   (i.e.,   from

CIVIL NO. 07-1875 (JP)          -22-

January 2000 through November 2002) $173 million in insurance premiums, which are 'the private property of the [JUA]' and 'which [Flores-Galarza] was bound by law to transfer to JUA.' JUA claimed from the Secretary in his personal capacity interest on the $173 million as well as $13.6 million as out of pocket funds which JUA reimbursed directly to privately insured motorists who had paid the double premiums and the amount of $10 million which JUA claimed were an excess reserve not belonging to the motor vehicle owners. JUA also sought to enjoin Flores-Galarza from withholding any more insurance premiums and trying to impose upon JUA the terms and conditions of the 2002 Amendment [Act 230] inasmuch as they would amount to an unconstitutional taking of JUA's property.

30. Said lawsuit ended in a settlement which is under seal. Plaintiffs in the García Rubiera v. Calderón case, Case No. 02-1179 (GAG), had requested consolidation of both cases but JUA opposed.

31. The transfers from JUA to the Secretary of the amounts accumulated in the reserve have continued. Aside from the $73,353,194 million retained by the Secretary as funds accumulated as of December 31, 2001, the amount of $45,312,301 million was transferred to the Secretary on August 6, 2004 as funds retained corresponding to the

CIVIL NO. 07-1875 (JP)          -23-

period ending December 31, 2003.  Also, on October 26,
2006, JUA transferred to the Secretary another
$30,921,395 million corresponding to the period ending
December 31, 2005.  On May 30, 2009, JUA transferred to
the Secretary of the Treasury the amount of $9,803,120.00
for the period ending December 31, 2006.

32.  On September 22, 2004 Law 253 was further amended by
Law 414.  The Statement of Purposes expressed:

Act No. 230 of September 24, 2002, (Act No. 230)
amended Act No. 253 of December 27, 1995, (Act
No. 253), among other purposes, to direct the
Joint Underwriting Association (JUA) to transfer
to the Secretary of the Treasury the funds
identified in the Joint Underwriting
Association's annual statement as Funds Retained
by the Insurer Belonging to Others. When Act
No. 236 was approved, the balance transferred to
the Secretary of the Treasury was $73 million,
of which $53 million (corresponding to the
reserve excess) were used to balance fiscal year
2001-2002.  The remaining $20 million were to
remain under the custody of the Secretary of the
Treasury for the payment of claims from drivers
who paid the Compulsory Motor Vehicle Liability
Insurance at the time of renewing their license
and who also have private insurance who they
renewed or acquired without having received a
credit for the amount they paid to the
Compulsory Motor Vehicle Liability Insurance.
After Act No. 230 was in effect for almost two
(2) years, the Department of the Treasury has
disbursed approximately $500,000 from the
$20 million available for payments to drivers.
Therefore, it must be pointed out that Act
No. 230 establishes that every two (2) years the
Joint Underwriting Association shall transfer to
the Secretary of the Treasury any amount accrued
in Funds Retained by the Insurer Belonging to
Others.  This Legislature deems it necessary

CIVIL NO. 07-1875 (JP)          -24-

> that the Secretary of the Treasury be able to
> cover into the General Fund of the Commonwealth
> of Puerto Rico part of the funds used for the
> payment of claims made by drivers, taking into
> consideration that the Special Fund into which
> such amount is covered shall continue to receive
> contributions and that the experience with
> disbursements demonstrates that the same have
> not been substantial.  Such funds shall be used
> as part of the estimated income of the Budget of
> the Commonwealth of Puerto Rico for fiscal
> year 2004-2005.

33.  Procedure 96 was approved by the Secretary of the Treasury

pursuant to the terms of Law 230 to provide a system of

reimbursement of the double premiums of the vehicle

owners.  It provided:

> a.   Copy of the Motor Vehicle Registration
>      License for which such reimbursement is
>      being claimed;
>
> b.   Copy of the insurance policy.  Said policy
>      shall be for each year that is being
>      claimed;
>
> c.   In the case such that it is the insurance
>      firm which is making the claim, it shall
>      attach certified copies of those policies
>      that it is claiming;
>
> d.   Certification of payment of the policy for
>      each year being claimed.    Such
>      certification shall be issued by the
>      insurance firm;
>
> e.   Certification that such insurance firm has
>      not received any reimbursement from [JUA],
>      nor has reimbursed the premium for the
>      Mandatory Liability Insurance, to the
>      insured party.
>
> It also required that the applicant did not have
> debts with the Secretary.

CIVIL NO. 07-1875 (JP)            -25-

34.  JUA issued the following press release:

> . . . we want that the citizens take advantage
> of this moment to request  this reimbursement
> that might well could represent additional money
> for many families  in this Christmas period.  To
> claim it they have only to present copy of the
> license of the vehicle with the stamp 'paid'
> together with the declaration of the policy that
> indicates the vehicle for which reimbursement is
> requested.  After December 29, these amounts
> will be transferred to the Department of the
> Treasury and reimbursement shall be requested
> through this agency which carries a process that
> will be more rigorous to everyone that may
> requested it.

35.  On September 27, 2007, Mr. José Blanco issued
Bulletin 2007-1 to all insurance companies that underwrite
Motor Vehicle Liability Insurance.  The Bulletin states:

> The Compulsory Vehicle Liability Insurance Joint
> Underwriters Association (JUA) recommends that
> all insurance companies request by December 31,
> 2007 the reimbursement of the compulsory
> liability insurance premiums paid by their
> insured during calendar years 2006-2007.  Our
> intent is that insurance companies may be able
> to avoid additional efforts and possible delays
> that may affect their clients in obtaining
> reimbursement, since Act No. 230 of
> September 24, 2002, requires JUA to transfer to
> the Puerto Rico Department of Treasury the total
> balance of the account withheld for others as of
> December 31, 2007.  Any compulsory vehicle
> liability premiums paid by policyholders from
> January 1, 2006 through December 31, 2007, which
> have not been claimed for reimbursement to JUA
> by December 31, 2007, will need to be claimed to
> the Department of Treasury in accordance with
> the procedures established by that Agency.
>
> The procedures for claiming reimbursement of
> compulsory vehicle liability premiums to JUA are
> specified on JUA Bulletin 2005-1 - New system

CIVIL NO. 07-1875 (JP)          -26-

> for reimbursement of Compulsory Liability Insurance, issued on June 30, 2005.
>
> It is important to highlight that the Puerto Rico Department of Treasury in a fiduciary capability, will retain the funds transferred by JUA during five (5) years. After that time, any funds not claimed will become part of the property of the Commonwealth of Puerto Rico.

36. On December 27, 1995, the Commonwealth of Puerto Rico enacted the Compulsory Motor Vehicle Liability Act, P.R. Act No. 253, 26 L.P.R.A. §§ 8051 et seq.

37. Effective January 1, 1998, this Act required all motor vehicles which travel on public thoroughfares to be covered by liability insurance with certain minimum requirements established therein.

38. To comply with this obligation, every vehicle owner must either (i) purchase the compulsory liability insurance by paying the corresponding premium at the time he acquires or renews a motor vehicle license, or (ii) opt out of the compulsory liability insurance scheme by purchasing traditional liability insurance with comparable or better coverage from a private insurer.

39. The Compulsory Motor Vehicle Liability Insurance Act did not provide a mechanism to accomplish this; however, it empowered the Insurance Commissioner (the "Commissioner") to issue regulations to coordinate the interaction between traditional liability insurance and the compulsory

CIVIL NO. 07-1875 (JP)          -27-

liability insurance, at all times assuring that the coverage required by the law was in place.

40. After close to a year of experience with the actual functioning of the compulsory liability insurance system, the P.R. Legislature concluded that there were several areas that deserved modification in order to expedite the execution of its provisions.

41. Accordingly, the Compulsory Motor Vehicle Liability Insurance Act was amended, *inter alia*,

> to empower the [Commissioner] to establish through regulations, a procedure that will allow motor vehicle owners who meet the insurance coverage required by law through a traditional liability insurance in effect, to present attesting proof of such compliance, without having to pay the compulsory liability insurance along with the payment for the issuing or renewal of motor vehicle licenses. Thus, motor vehicle owners shall not have to unnecessarily disburse any sum of money whatsoever on account of compulsory liability insurance at the time of the issuing or renewal of their motor vehicle licenses, while they hold and can prove they have the traditional liability insurance.

42. Pursuant to this delegation, the Commissioner issued Regulation LXX for the Instrumentation of the Compulsory Motor Vehicle Liability Insurance to ensure, among other things, that the owners of motor vehicle owners who purchased traditional liability insurance would either not have to pay the corresponding premium when they acquired or renewed their vehicle license or be able to obtain a

CIVIL NO. 07-1875 (JP)            -28-

refund of the amounts paid.  Thus, to avoid the double
payment of the compulsory insurance premium by holders of
traditional insurance, Regulation LXX provided for the JUA
to issue a check payable to the Secretary of the Treasury
to be used by holders of traditional liability insurance
to pay for the compulsory liability insurance premiums at
the moment of renewing their licenses.

43.  Regulation LXX also provided that:

> Any compulsory liability insurance can be
> substituted for a traditional liability
> insurance issued by a private insurer if it has
> equal or better coverage than the compulsory
> liability insurance.  In such cases, any
> unearned premium for the compulsory liability
> insurance shall be credited towards the payment
> of the traditional liability insurance . . . .

44.  On July 22, 1998, Article 10(a) of Regulation LXX was
amended to provide that:

> In the same manner, when it is not possible to
> comply with the requirement of notice to the
> [JUA] within the period established herein due
> to the insured's failure to provide to insurer
> with the information required in Request for
> Information Form sent to him, the traditional
> liability insurer shall notify the motor vehicle
> owner of the need for him to pay the SECRETARY
> OF THE TREASURY for the compulsory liability
> insurance.  The insurer will refund to the
> insured the amount paid as soon as he receives
> the information required in the Request for
> Information Form and evidence that the payment
> [of the compulsory liability insurance] was
> made.  If the insurer does not receive the
> information required in the Request for
> Information Form, he shall deduct the amount
> paid [for the compulsory liability insurance]

CIVIL NO. 07-1875 (JP)          -29-

> from the next renewal of the traditional
> liability insurance so long as the insured
> provides evidence that the payment was made. If
> the traditional liability insurance is cancelled
> or not renewed, the insurer shall reimburse the
> amount paid together with any unearned premiums.
>
> On the other hand, if a traditional liability
> insurer does not comply with the notice
> requirement to the [JUA] within the established
> period despite the insurer having provided the
> information required in the Request for
> Information Form, the traditional liability
> insurer shall notify the motor vehicle owner of
> the need for him to pay to the SECRETARY OF THE
> TREASURY the premium for the compulsory
> liability insurance. The insurer shall
> reimburse to the insured the amount paid [for
> compulsory liability insurance] as soon as it
> receives evidence that such payment was made.

45. Regulation LXX was further amended on September 15, 2000
to provide for an alternate mechanism to the issuance of
a check for a traditional liability policy holder to avoid
paying the compulsory liability insurance when renewing
his vehicle's license:

> So long as allowed by the Secretary of the
> Treasury, at the time of acquiring or renewing
> the motor vehicle license . . . of any [private]
> vehicle . . ., if such vehicle is covered by a
> traditional liability insurance policy with and
> equal or better coverage than that provided by
> the compulsory liability insurance or by a
> compulsory liability insurance issued by a
> private insurer, instead of the check mentioned
> in section (a) of Article 10 of this Regulation,
> a certification issued by the [JUA] or by the
> insurer to the effect that the vehicle is
> covered by a traditional liability insurance
> policy with and equal or better coverage than
> that provided by the compulsory liability
> insurance or by a compulsory liability insurance

CIVIL NO. 07-1875 (JP)          -30-

> may be used as satisfactory evidence of
> compliance with the insurance required by Law.

46. In order to establish the procedure for the use and issuance of the abovementioned certificate, the Commissioner issued Letter No. N-C-2-1-2001 of February 1, 2001.

47. With regards to those holders of traditional liability insurance who did not use the certificate to avoid the payment of the compulsory liability insurance at the moment of acquiring or renewing their motor vehicle's license, it provided that:

> the Insurer of the liability insurance who
> issued or should have issued the Certificate
> shall reimburse to the insured the amount paid
> as soon as evidence of such is received.
> Afterwards, said Insurer shall request from the
> [JUA] the corresponding reimbursement for the
> payment made by the insured . . . . No Insurer
> shall wait for the reimbursement requested from
> the [JUA] to issue the reimbursement of the
> premium to its insured.

48. In 2002, the P.R. Legislature amended the Compulsory Motor Vehicle Liability Insurance Act to provide for the transfer of those funds to the P.R. Department of the Treasury.

49. The statute provided for the Secretary of the Treasury to retain these funds as a trustee for a period of five (5) years from the date in which the funds are transferred by

CIVIL NO. 07-1875 (JP)                -31-

          the Association, after which the funds would be forfeited
          to the Commonwealth of Puerto Rico.

50.   The statute also ordered the Secretary of the Treasury to
      establish procedures to entertain claims by those persons
      alleging to have a right to the transferred funds.

51.   To process the requests for reimbursements from holders of
      traditional liability insurance, the Secretary of the
      Treasury issued Procedure 96.

52.   In order to initiate the reimbursement process, the
      Procedure requires the person with a right to
      reimbursement to fill out a form and provide certain
      evidence of the payment of two different liability
      insurance policies.

53.   Once this information is validated and it is verified that
      the person has no outstanding tax liability, the Secretary
      of the Treasury is supposed to issue the reimbursement.

54.   The Secretary of the Treasury also issued Procedure 101 to
      process the requests for reimbursements from traditional
      liability insurers who reimbursed their clients and, thus,
      gained the right to have the compulsory liability premium
      paid by their clients to the Secretary of the Treasury
      distributed to them.

55.   Act 414 of September 22, 2004 provided, in pertinent part,
      as follows:

CIVIL NO. 07-1875 (JP)          -32-

> The Secretary of the Treasury is hereby authorized to transfer to the General Fund of the Commonwealth of Puerto Rico the amount of nineteen million dollars ($19,000,000) from said funds, which may be used as resources after the closing of the fiscal year ending June 30, 2005. If necessary, the General Fund and the Budgetary Fund shall take responsibility for any claim that cannot be covered by the amount that the Joint Underwriting Association shall transfer to the Secretary of the Treasury every two (2) years.

56. On November 13, 2002, the Treasury Department informed the Association that it was retaining the amount of $73,353,194.00 from certain funds belonging to the Association that the Treasury Department had in its possession. This retention was supposed to satisfy the transfer of funds listed in the Association's Annual Statement as of December 31, 2001 as "Amounts Withheld or Retained by the Company for Account of Others[,]" required by Act 230.

57. On August 6, 2004, the Association paid to the Treasury Department an amount of corresponding to the item identified as "Amounts Withheld or Retained by the Company for Account of Others" in the Association's Annual Statement as of December 31, 2003.

58. On October 26, 2006, the Association paid to the Treasury Department an amount corresponding to the portion of the item identified as "Amounts Withheld or Retained by the

CIVIL NO. 07-1875 (JP)          -33-

Company for Account of Others" in the Association's Annual
Statement as of December 31, 2005 which could be subjected
to a claim of reimbursement.

59. On March 30, 2009, the Association paid to the Treasury
Department an amount corresponding to the portion of the
item identified as "Amounts Withheld or Retained by the
Company for Account of Others" in the Association's Annual
Statement as of December 31, 2008 which had been on the
books for more than two (2) years and which could be the
subject of a claim for reimbursement (i.e., paid to the
Treasury Department prior to December 31, 2006 and not
claimed by a traditional insurance company as of
December 31, 2008).

60. As of March 30, 2009, the Treasury Department had received
the total amount of $157,206,722.00 pursuant to Act 230.

61. As of August 20, 2007, the Treasury Department had
disbursed the total amount of $6,479,610.05 pertaining to
compulsory liability reimbursements.  Said amount was
disbursed as follows: (1) a total of $211,068.56 had been
disbursed to individuals in 2,064 cases; (2) a total
amount of $5,872,681.51 had been disbursed to insurance
companies in 50,628 cases; (3) a total of $274,071.98 had
been disbursed to corporate individuals in 2,197 cases;

CIVIL NO. 07-1875 (JP)              -34-

and (4) a total amount of $134,952.50 had been disbursed
to Municipalities in 1,178 cases.

62.   As of November 30, 2007, the Treasury Department had
disbursed the total amount of $6,954,905.32 pertaining to
compulsory liability reimbursements.

63.   The purpose behind Act 230 was to increase revenue for the
Government of Puerto Rico.

64.   Act 201 of December 29, 2009 modified the requirements of
Act 230 as follows:

> The [Association] shall transfer to the
> Secretary of the Treasury the funds identified
> in its Annual Statement as "Amounts Withheld or
> Retained by Company on Account of Others". The
> [Association] shall transfer those amounts that
> represent the share that as of the closing of
> December 31 have remained in its books for more
> than two (2) years from the date the premiums
> were collected together with the issuance or
> renewal of a motor vehicle's license. Said
> transfer shall be made annually on March 30 of
> the year following the closing of the year for
> which the transfer is made. If the item
> identified as Amounts Withheld or Retained by
> Company on Account of Others" was overestimated,
> the [Association] shall provide the Department
> of the Treasury the evidence that supports such
> occurrence. The Department of the Treasury
> shall return or credit the [Association] the
> total amount of the overestimate. If the
> amounts were underestimated, the [Association]
> will notify the Department of the Treasury and
> will send the corresponding amounts. In these
> cases, both parties shall have ninety (90) days
> from the notice and submission of the evidence
> to issue the payment or to credit the
> corresponding amounts. For purposes of this
> Article, a credit shall be understood as those
> monetary amounts that the [Association] or the

CIVIL NO. 07-1875 (JP)            -35-

    Department of the Treasury may deduct prospectively from the collection charge or from the next transfer of "Amounts Withheld" previously mentioned.

    The Secretary of the Treasury shall retain those funds transferred by the [Association] as trustee for a period of five (5) years from the date in which the retained funds are transferred by the [Association] to the Secretary of the Treasury.

    The income generated by these funds shall revert to the General Fund of the Commonwealth Treasury as they are accrued.  The Secretary of the Treasury shall establish a procedure for processing the reimbursement request from any person alleging a right to the retained funds. Once five (5) years [have] elapse[d] without the consumer claiming the retained funds, these shall become property of the Commonwealth of Puerto Rico and they shall pass to the General Fund of the Commonwealth Treasury.

65.  Plaintiff Adalberto Avilés-Candelaria:

    a.  Following a request by the traditional insurance company, on November 22, 2001, the Association distributed to Real Legacy Insurance the amount of $99.00 for the compulsory liability insurance paid by Adalberto Avilés-Candelaria for the year 1998 for a vehicle with VIN number 23GLJC1240WS827024.

    b.  Following a request by the traditional insurance company, on October 17, 2001, the Association distributed to Real Legacy Insurance the amount of $99.00 for the compulsory liability insurance paid by Mr. Avilés-Candelaria for the year 1999 for a vehicle with VIN number 23GLJC1240WS827024.

    c.  There is no evidence that Mr. Avilés-Candelaria paid twice for the

CIVIL NO. 07-1875 (JP)          -36-

      compulsory liability insurance during the
      period from 2000 to the present.

d.   None of the funds confiscated by the
      Treasury Department on November 11,
      2002—corresponding to premiums paid from
      1997 to December 31, 2001— were subject to
      a claim for reimbursement by
      Mr. Avilés-Candelaria or correspond to
      compulsory liability insurance paid for a
      vehicle with VIN number 23GLJC1240WS827024.

e.   None of the funds transferred to the
      Treasury Department on August 6,
      2004—corresponding to premiums paid from
      January 1, 2002 to December 31, 2003— was
      subject to a claim for reimbursement by
      Mr. Avilés-Candelaria or corresponds to
      compulsory liability insurance paid for a
      vehicle with VIN number 23GLJC1240WS827024.

f.   None of the funds transferred to the
      Treasury Department on October 26,
      2006—corresponding to premiums paid from
      January 1, 2004 to December 31, 2005— was
      subject to a claim for reimbursement by
      Mr. Avilés-Candelaria or corresponds to
      compulsory liability insurance paid for a
      vehicle with VIN number 23GLJC1240WS827024.

g.   None of the funds transferred to the
      Treasury Department on March 30,
      2009—corresponding to premiums paid from
      January 1, 2006 to December 31, 2006— was
      subject to a claim for reimbursement by
      Mr. Avilés-Candelaria or corresponds to
      compulsory liability insurance paid for a
      vehicle with VIN number 23GLJC1240WS827024.

h.   Even if, prospectively,
      Mr. Avilés-Candelaria decided to purchase
      compulsory liability insurance through a
      traditional insurance company, decided to
      not use the Certificate of Compliance to
      avoid having to pay a second time for the
      compulsory liability insurance at the time
      he renews his motor vehicle's license, and

CIVIL NO. 07-1875 (JP)          -37-

> decided not to seek reimbursement through her traditional insurance company, the Association would not transfer any funds to the Treasury Department from which Mr. Avilés-Candelaria could claim reimbursement until after December 31, 2013.

66. Plaintiff Noemí Valentín-Marrero:

a. There is no evidence that Noemí Valentín-Marrero paid twice for the compulsory liability insurance to cover the period January 1, 2008 to July 4, 2005.

b. Following a request by the traditional insurance company, on September 30, 2005, the Association distributed to Universal Insurance the amount of $107.25 for the compulsory liability insurance paid by Ms. Valentín-Marrero to the Treasury Department for the year ending June 30, 2006 for a vehicle with VIN number JM1BK143351322985 and license plate number GJM026.

c. None of the funds transferred to the Treasury Department on October 26, 2006—corresponding to premiums paid between January 1, 2004 and December 31, 2005— was subject to a claim for reimbursement by Ms. Valentín-Marrero or corresponded to compulsory liability insurance paid for vehicle with VIN number JM1BK143351322985 and license plate number GJM026.

d. Following a request by the traditional insurance company, on October 9, 2006, the Association distributed to Cooperativa de Seguros Múltiples the amount of $99.00 for the compulsory liability insurance paid by Ms. Valentín-Marrero to the Treasury Department for the year ending August 3, 2007 for a vehicle with VIN number JM1BK143351322985 and license plate number GJM026.

CIVIL NO. 07-1875 (JP)          -38-

   e. None of the funds transferred to the
Treasury Department on March 30,
2009—corresponding to premiums paid between
January 1, 2006 and December 31, 2006— was
subject to a claim for reimbursement by
Ms. Valentín-Marrero or corresponded to
compulsory liability insurance paid for
vehicle with VIN number JM1BK143351322985
and license plate number GJM026.

   f. On May 11, 2007, a Certificate of
Compliance was issued for a vehicle
registered to Ms. Valentín-Marrero with VIN
number JM1BK143351322985 and license plate
number GJM026.

   g. Ms. Valentín-Marrero did not use this
Certificate of Compliance to avoid paying
for the compulsory liability insurance at
the time of renewal of her vehicle's
license.

   h. In July 2007, Ms. Valentín-Marrero paid to
the Treasury Department the amount of
$99.00 for compulsory liability insurance
for the year ending August 3, 2008 for a
vehicle with VIN number JM1BK143351322985
and license plate number GJM026.

   i. Following a request by the traditional
insurance company, on August 23, 2007, the
Association distributed to Cooperativa de
Seguros Múltiples the amount of $99.00 for
the compulsory liability insurance paid by
Ms. Valentín-Marrero to the Treasury
Department for the year ending August 3,
2008 for a vehicle with VIN
number JM1BK143351322985 and license plate
number GJM026.

   j. On June 30, 2008, a Certificate of
Compliance was issued for a vehicle
registered to Ms. Valentín-Marrero with VIN
number JM1BK143351322985 and license plate
number GJM026.

CIVIL NO. 07-1875 (JP)              -39-

        k.    On June 1, 2009, a Certificate of Compliance was issued for a vehicle registered to Ms. Valentín-Marrero with VIN number JM1BK143351322985 and license plate number GJM026.

        l.    E v e n   i f , p r o s p e c t i v e l y , Ms. Valentín-Marrero decided to purchase compulsory liability insurance through a traditional insurance company, decided to not use the Certificate of Compliance to avoid having to pay a second time for the compulsory liability insurance at the time she renews her motor vehicle's license, and decided not to seek reimbursement through her traditional insurance company, the Association will not transfer any funds to the Treasury Department from which she could claim reimbursement until after December 31, 2011.

The following facts are deemed uncontested by the Court ("UMF") because they were included in the motion for summary judgment and opposition and were agreed upon, or they were properly supported by evidence and not genuinely opposed.[2]

**Avoidance of Duplicate Payments or Prompt Reimbursement**

        1.    In order to acquire a credit on his insurance premium a vehicle owner must provide a correct and legible copy of his vehicle license to his insurer in order to evidence his payment of the compulsory liability insurance.

---

2.    The Court notes that while many of the facts submitted by the parties with their respective statements of proposed uncontested facts and oppositions are uncontested, the Court omitted most of those facts because said facts are already listed above in the facts stipulated to in the ISC Order and/or are irrelevant to the dispositive issue in this case.

CIVIL NO. 07-1875 (JP)            -40-

> 2.    In order to receive reimbursement from a traditional
>        insurer, a vehicle owner must present a correct and
>        legible copy of his vehicle license in order to evidence
>        that he has paid the compulsory insurance premium.
>
> 3.    In summary, under applicable norms and regulations, there
>        are at least two ways to avoid making duplicate compulsory
>        premium insurance payments: (1) a vehicle owner can avoid
>        making a payment to the Secretary of the Treasury at the
>        time his vehicle license is acquired or renewed by paying
>        with a check issued by the Association made out to the
>        Secretary of the Treasury or by presenting a certificate
>        of compliance or (2) if the vehicle owner pays the
>        compulsory insurance premium to the Secretary of the
>        Treasury, he can seek a credit of that premium to his
>        traditional insurance premium from his insurer.

**Vehicle Owners Right to Payment Directly from the Association**

> 4.    Under Normative Letter to All Insurers Authorized to
>        Underwrite Vehicle Insurances in Puerto Rico Including the
>        Joint Underwriting Asociation of Obligatory Liability
>        Insurance, No. C-2-1-2001 of February 1, 2001, "[n]o
>        Insurer shall wait for the reimbursement requested from
>        the [Association] to issue the reimbursement of the
>        premium to its insured."

CIVIL NO. 07-1875 (JP)            -41-

5.    When double payment is not avoided, it is the traditional
      insurer, after requirement by the policy holder and
      evidence of payment, who must return to the policyholder
      the compulsory liability insurance portion of the
      traditional liability policy charged.

6.    This right to reimbursement of the compulsory liability
      insurance portion of the traditional liability is separate
      and independent from the traditional insurer's right to
      receive a disbursement from the premiums collected by the
      Secretary of the Treasury and transferred to the
      Association.  Regulation 5832, Art. 5 ("The insurer will
      refund to the insured the amount paid as soon as he
      receives [evidence that payment was made to the Secretary
      of the Treasury]").

7.    As a result, it is the traditional liability insurer who
      is liable for reimbursement of the double payment, and
      that liability exists whether the Association has
      forwarded amounts corresponding to the reimbursement or
      not.

8.    Although the Association reimburses traditional insurance
      carriers for reimbursements made or credits given by them
      to vehicle owners, vehicle owners are not entitled to
      receive reimbursement or payment directly from the
      Association.

CIVIL NO. 07-1875 (JP)            -42-

9.   In 2001, the Association briefly instituted a practice of issuing checks directly to motor vehicle owners. This practice was quickly discontinued based on the fact that the practice was not authorized by law or regulation.

**Amounts Retained or Withheld by Company on Account of Others**

10.   The Secretary of the Treasury makes transfers to the Association of compulsory insurance premiums received pursuant to Act 253.

11.   Initially, these transfers were received from the Treasury in lump sum payments without any identifying information showing which vehicle owners or vehicles were covered by the premiums forwarded to the Association.

12.   In order to be able to reimburse traditional insurance companies for credits given or reimbursements made to vehicle owners who pay the Secretary of the Treasury the compulsory insurance premium, the Association has, since its inception, maintained a separate accounting entry on its balance sheet entitled "Amounts Retained or Withheld by Company on Account of Others[.]"

13.   This amount is not meant to constitute an accurate accounting of the reimbursements which are outstanding, rather it represents an estimate of outstanding reimbursements.

CIVIL NO. 07-1875 (JP)          -43-

## Act 230 - Transfer of Funds to the Secretary of the Treasury

14. Act 230 required the Association to transfer any amounts accumulated on account of "Amounts Retained or Withheld by Company on Account of Others" every two years.

15. The monetary transfer provided for in Act 230 is stated in mandatory terms, and the Association has no discretion to refuse to transfer those funds.

16. Act 230 provided for the Secretary of the Treasury to retain these funds as trustee for a period of five (5) years from the date in which the retained funds were transferred by the Association. After the passage of five years, without any claim on these funds being made, they would become the property of the Commonwealth of Puerto Rico.

## Reimbursement from the Commonwealth of Puerto Rico

17. Act 230 required the Secretary of the Treasury to establish a procedure to address requests for reimbursement "from any person alleging a right to the retained funds."

18. To process the requests for reimbursements from holders of traditional liability insurance who claim to have made duplicate payments, the Secretary of the Treasury issued Procedure 96.

CIVIL NO. 07-1875 (JP)          -44-

19.  Nothing prevents a vehicle owner with a claim to
     reimbursement for duplicate payments which have been
     transferred to the Puerto Rico Treasury from making his
     claim to his insurance carrier, who would then have the
     obligation to issue reimbursement and make his claim to
     the Secretary of the Treasury himself.

20.  Procedure 96 specifically contemplates that traditional
     insurers can make a claim for reimbursement under this
     procedure.

21.  The Secretary of the Treasury has also promulgated
     Procedure 101, which sets out how to process claims for
     reimbursement of duplicate payments which are made by
     traditional insurance carriers.  This procedure requires
     substantially the same information as Procedure 96,
     additionally requiring that the insurance carrier certify
     that he has already reimbursed the insured.

22.  The information required is directed merely to ensuring
     that the claimant, in fact made a duplicate payment and
     has not received reimbursement.

II.  **LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

Summary judgment serves to assess the proof to determine if
there is a genuine need for trial.  <u>Garside v. Osco Drug, Inc.</u>,
895 F.2d 46, 50 (1st Cir. 1990).  Pursuant to Rule 56© of the Federal
Rules of Civil Procedure, summary judgment is appropriate when "the

CIVIL NO. 07-1875 (JP)          -45-

record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©; see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Ins. Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992).  The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case.  See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant

CIVIL NO. 07-1875 (JP)          -46-

meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See Anderson, 477 U.S. at 248; Celotex, 477 U.S. at 324; Goldman, 985 F.2d at 1116.

## III. **ANALYSIS**

Defendant argues, *inter alia*, that its motions for summary judgment should be granted because: (1) Defendant's actions did not cause any deprivation to Plaintiffs; (2) Plaintiffs' substantive due process claim fails since Act 230 meets the rational basis scrutiny standard used to examine economic regulations; (3) Plaintiffs' takings and procedural due process claims fail since Plaintiffs lack a property interest in the funds while they are under the control of the Association; and (4) Defendant's action in this case does not give rise to liability under Article 1802 of Puerto Rico's Civil Code.  Plaintiffs oppose the motions and argue that partial summary judgment should be granted in their favor on the substantive due process, procedural due process and takings claims.  The Court will focus its analysis on whether Defendant deprived Plaintiffs of any federally protected right because it is the dispositive issue in the case.

CIVIL NO. 07-1875 (JP)          -47-

A.   **Section 1983 Claims**

Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . .'" Rockwell v. Cape Cod Hospital, 26 F.3d 254, 256 (1st Cir. 1994) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982)). To succeed on their Section 1983 claims, Plaintiffs must make two showings:  the existence of a federal or statutory right; and a deprivation of that right by a person acting under color of state law.   See id. (citing Watterson v. Page, 987 F.2d 1, 7 (1st Cir. 1993)).

In the instant case, Defendant argues that the Section 1983 claims fail because no deprivation was caused by Defendant's transfer, pursuant to Act 230, of the funds held in the reserve to the Secretary of the Treasury.  Plaintiffs counter that said transfer of funds constituted a deprivation.

1.   **Funds Appropriated by Department of Treasury in 2002**

The Court notes that Plaintiffs have no claims against Defendant with regard to the funds appropriated by the Department of the Treasury in 2002 because no action was taken by the Association. During said time, the Commonwealth of Puerto Rico unilaterally effectuated a set off by retaining the monies owed to the Association in satisfaction of the transfer which should have been effected

CIVIL NO. 07-1875 (JP)          -48-

pursuant to Act 230.  ISC UMF 21, 26, 28, and 56.  Since there was
no action by the Association, Defendant did not deprive Plaintiffs
of any right.

### 2.  Transfers from the Association to the Department of Treasury

Plaintiffs argue that the transfers effectuated by the
Association to the Department of the Treasury pursuant to Act 230
have deprived them of their federally protected rights because:
(1) after the transfers, motor vehicle owners such as Plaintiffs can
only receive reimbursement from the Department of the Treasury
through the difficult and cumbersome process set out in Procedure 96;
(2) Defendant breached its duty to distribute the funds directly to
individual motor vehicle owners; (3) Defendant transferred the funds
to the Department of the Treasury without providing notice to motor
vehicle owners; and (4) Defendant's transfer of funds constituted
state action.

#### a.  Reimbursement after Funds Transferred pursuant to Act 230

Plaintiffs' argument that, after the transfer to the Department
of the Treasury, motor vehicle owners can only be reimbursed by the
Department of the Treasury through the allegedly difficult and
cumbersome process set out in Procedure 96 fails.  Contrary to
Plaintiffs' argument, the uncontested evidence in this case shows
that, if anything, Plaintiffs have gained an additional avenue for
reimbursement.  Under the statutory and regulatory scheme of Act 253,

CIVIL NO. 07-1875 (JP)          -49-

motor vehicle owners could only seek reimbursement of the double premiums through their traditional insurance company.  ISC UMF 14, 18 and 47, and UMF 2 and 3.

In addition to requiring the transfer of funds to the Department of Treasury, Act 230 required that the Secretary of Treasury establish procedures to address motor vehicle owners requests for reimbursements on those funds which were transferred.  ISC UMF 50 and UMF 17.  To process requests for reimbursements from holders of traditional liability insurance, the Secretary of Treasury issued Procedure 96.  ISC UMF 51 and UMF 18.  Said procedure allows motor vehicle owners to request reimbursement directly from the Department of the Treasury.  ISC UMF 34.

Motor vehicle owners can also request reimbursement from their private insurer.  The Court notes that nothing prevents motor vehicle owners entitled to reimbursement for duplicate payments which have been transferred to the Secretary of Treasury from making his or her request directly to the traditional insurance carrier.  UMF 19.  Said insurer would then issue the reimbursement to the motor vehicle owner and make its claim to the Secretary of Treasury itself.  UMF 19.  In fact, the specific language of Procedure 96 contemplates that traditional insurers can make a claim for reimbursement under this procedure.  ISC UMF 33 and UMF 20.  Specifically, said procedure states what information must be provided if the insurance company,

CIVIL NO. 07-1875 (JP)          -50-

as opposed to the insured, seeks reimbursement from the Department
of Treasury (No. 174-3, p. 2).

    Based on said uncontested evidence and on the text of the
procedure, the Court finds that Plaintiffs can, after the transfer
of funds, still request reimbursement from their traditional
insurance carrier.  As such, Plaintiffs' argument fails because
Plaintiffs have suffered no deprivation as a result of the transfer
of funds since motor vehicle owners can, as they could do prior to
the transfer of the funds, still request reimbursement directly from
their traditional insurer and, in addition, now have the option of
reimbursement directly through the Department of Treasury.  Put
simply, Plaintiffs have suffered no deprivation because they are in
a better position to request reimbursement on their duplicate
premiums than prior to the transfer.

                    b.    *Alleged Breach by Defendant of its Duty to
                          Directly Reimburse Double Premiums to Motor
                          Vehicle Owners*

    Plaintiffs argue that they have suffered a deprivation because
Defendant breached its duty to directly reimburse the double premiums
to motor vehicle owners when it transferred the funds to the
Secretary of Treasury.  Specifically, Plaintiffs argue that Defendant
owes said duty because: (1) at one point in time, Defendant directly
reimbursed to motor vehicle owners the double premiums; (2) the Court
of Appeals for the First Circuit in Asociación de Suscripción
Conjunta del Seguro de Responsabilidad Obligatorio v. Flores-Galarza,

CIVIL NO. 07-1875 (JP)          -51-

484 F.3d 1 (1st Cir. 2007), determined that the Association had said duty; and (3) the Insurance Code imposes a duty on the Association to directly reimburse the double premiums to Plaintiffs.

After considering the arguments, the Court disagrees with Plaintiffs. It is undisputed that for a short period of time Defendant directly reimbursed privately insured motorists who had paid the double premiums. ISC UMF 29 and UMF 9. However, said practice was discontinued because it was not authorized. UMF 9. The problem with Plaintiffs argument is that the fact that the Association directly reimbursed motorists at one point in time is not sufficient to reach the conclusion that the Association had such duty. Also, Plaintiffs have not pointed to any case law which would support said conclusion. As such, the Court finds that Plaintiffs' argument fails.

With regard to the Flores-Galarza decision, Plaintiffs argue Defendant has a duty to directly reimburse motor vehicle owners who paid the double premium because the First Circuit allegedly held that reimbursements would be made either by the insurer or the Association. Flores-Galarza, 484 F.3d at 7. Said argument fails. While it is true that in Flores-Galarza the First Circuit stated that motor vehicle owners could seek reimbursement from the Association, said statement is dicta. Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 459 (1st Cir. 1992) (explaining that dictum are "observations relevant, but not essential, to the

CIVIL NO. 07-1875 (JP)          -52-

determination of the legal questions then before the court.  Dictum

constitutes  neither  the  law  of  the  case  nor  the  stuff  of  binding

precedent . . . .  In short, dictum contained in an appellate court's

opinion  has  no  preclusive  effect  in  subsequent  proceedings  in  the

same, or any other, case.").  The statement relied on by Plaintiffs

was  made  while  discussing  the  background  behind  Act  253  and  no

statute  or  case  law  was  cited  to  support  said  statement.   See

Flores-Galarza,  484  F.3d  at  6-7.   Lastly,  the  Court  disagrees  with

Plaintiffs  argument  that  Insurance  Code  requires  that  Defendant

directly  reimburse  motor  vehicle  owners  the  double  premiums.   No

provision  in  the  Insurance  Code  supports  said  conclusion.

> ### c.    Transfer of Funds without Notice

Plaintiffs  argue  that  Defendant's  motion  for  summary  judgment

should  be  denied  because  Defendant  transferred  the  funds  to  the

Department  of  the  Treasury  without  providing  them  with  notice  as

required by García Rubiera v. Calderón, 570 F.3d 443 (1st Cir. 2009).

Plaintiffs'  argument  fails.   In  García  Rubiera,  the  First

Circuit  held  that  for  Plaintiffs  to  be  entitled  to  notice  of  the

transfer  of  funds  they  had  to  show  that  they  had  a  property  interest

in  the  funds  and  that  Defendant  deprived  them  of  said  interest

without  constitutionally  adequate  process.   Id. at 457.   Similar  to

this  case,  the  alleged  deprivation  in  said  case  was  the  transfer  of

the  duplicate  premiums  to  the  Secretary  of  the  Treasury  pursuant  to

Act  230.   Id.

CIVIL NO. 07-1875 (JP)          -53-

While the First Circuit determined that Plaintiffs in that case had a property right to the transferred double premiums, contrary to Plaintiffs' contention, the First Circuit did not conclude that notice was required for the transfer of funds. Id. at 457-58. Instead, the First Circuit remanded the case "to the district court for further proceedings to determine whether the transfers of the duplicate premiums mandated by [Act] 230 constitute a sufficient deprivation for purposes of the Due Process Clause." Id. at 458.

As already explained in this Opinion and Order, Defendant's transfer of the double premiums to the Department of the Treasury did not cause any deprivation to Plaintiffs. Since Plaintiffs suffered no deprivation, the Court determines that Plaintiffs were not entitled to any notice in this case. Id. at 457-58 (requiring both a property right in the funds and a deprivation in order for Plaintiffs to be entitled to notice).

### d.   State Action

Plaintiffs argue that Defendant's motion for summary judgment should be denied because Defendant engaged in state action when it transferred the funds to Department of the Treasury pursuant to Act 230. After considering the argument, the Court finds that Plaintiffs' argument misses the mark. Even assuming that Defendant did engage in state action when it transferred the double premiums, the Court would still enter summary judgment in Defendant's favor because Plaintiffs have not been deprived of any protected right by

CIVIL NO. 07-1875 (JP)          -54-

virtue of Defendant's act of transferring the funds. <u>Sánchez v.
Pereira-Castillo</u>, 590 F.3d 31, 41 (1st Cir. 2009) (explaining that
Section 1983 requires not only state action but also the deprivation
of a right and a causal connection between the actor and the
deprivation).

    Since Plaintiffs have not been deprived of any protected right
by virtue of the challenged action of the Association, the Court
finds that Plaintiffs cannot succeed on their Section 1983 claims and
therefore Defendant's summary judgment motion on the federal law
claims is granted.   In light of the Court's decision to grant
Defendant's motion for summary judgment on the federal law claims,
Plaintiffs' motion for summary judgment is hereby denied.

        **B.**   **<u>Puerto Rico Law Claims</u>**

    In the instant case, Plaintiffs also bring state law claims.
Dismissal of pending state law claims is proper because an
independent jurisdictional basis is lacking. Exercising jurisdiction
over pendent state law claims once the federal law claims are no
longer present in the lawsuit is discretionary. <u>See</u> <u>Newman v.
Burgin</u>, 930 F.2d 955, 963 (1st Cir. 1991) (holding that "[t]he power
of a federal court to hear and to determine state-law claims in
nondiversity cases depends upon the presence of at least one
'substantial' federal claim in the lawsuit . . . [and] the district
court has considerable authority whether or not to exercise this

CIVIL NO. 07-1875 (JP)                -55-

power, in light of such considerations as judicial economy, convenience, fairness to litigants, and comity[]").

In the instant case, the Court chooses not to hear the state law claims brought by Plaintiffs. As such, the Court will dismiss the state law claims without prejudice. Since the Court has chosen not to hear the state law claims, Defendant's motion for summary judgment on the state law claims is **MOOT.**

IV.   <u>CONCLUSION</u>

In conclusion, the Court: (1) **GRANTS** Defendant's motion (**No. 167**) for summary judgment on the federal law claims; (2) **DENIES** Plaintiffs' motion (**No. 160**) for summary judgment; and (3) **FINDS AS MOOT** Defendant's motion (**No. 164**) for summary judgment on the Puerto Rico Law claims.[3] Also, as explained above, the Court will dismiss Plaintiffs' Puerto Rico law claims without prejudice. The Court will enter a separate judgment accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 22nd day of December, 2010.

<u>                  s/José Antonio Fusté                  </u>
JOSÉ ANTONIO FUSTÉ
CHIEF U.S. DISTRICT JUDGE

---

3.     Also before the Court is Defendant Association's motion to dismiss (**No. 77**). In light of the Court's decision on the motions for summary judgment, said motion is **MOOT.**